## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES WILLIAMS BEY,

               Plaintiff

    v.

PENNSYLVANIA BOARD OF
PROBATION AND PAROLE, et al.,

               Defendants

CIVIL ACTION NO. 1:10-CV-02597

(CAPUTO, J.)
(MEHALCHICK, M.J.)

## REPORT AND RECOMMENDATION

This is a prisoner civil rights action, initiated upon the filing of a complaint in this matter on December 21, 2010. (Doc. 1). Plaintiff Charles Williams Bey alleges claims against David Varano, the Superintendent at the Coal Township State Correctional Institute ("SCI-Coal Township"), and SCI-Coal Township employees Linda Chismar, Mike Miller, Ms. Pyar, and Mr. Vivian; chairperson of the Pennsylvania Board of Probation and Parole ("PBPP") Catherine McVey; the PBPP itself; Pennsylvania Department of Corrections ("DOC") officials Jeffrey Beard and Dorina Varner; and the Pennsylvania Department of Health, Office of Drug and Alcohol Programs ("DOH"). (Doc. 1). Specifically, Plaintiff brings claims under 42 U.S.C. § 1983 for alleged violations of his First and Fourteenth Amendment rights, a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc et seq., and various state law claims. (Doc. 1). At all times relevant to the complaint, Plaintiff has been incarcerated at SCI-Coal Township in Coal Township, Pennsylvania.

I.   **BACKGROUND**

    A.   PROCEDURAL BACKGROUND

On June 21, 2011, Defendants filed a motion to dismiss Plaintiff's complaint. (Doc. 19). Plaintiff filed for a preliminary injunction and a temporary restraining order on November 16, 2011. (Doc. 30). On April 4, 2012, the Court denied each of these motions. (Doc. 37). Defendants then answered the complaint (Doc. 38), and proceeded with the discovery process. On November 20, 2012, Plaintiff filed a motion for summary judgment (Doc. 60), along with a brief in support of that motion. (Doc. 61). Defendants filed a response to Plaintiff's motion for summary judgment on December 4, 2012. (Doc. 65). Additionally, on December 12, 2012, Defendants filed their own motion for summary judgment (Doc. 67), a brief in support (Doc. 68), and a statement of material facts. (Doc. 69). Given that the time for filing a reply brief has long passed, these cross-motions for summary judgment are now ripe for disposition.[1]

---

    [1] After the close of discovery, Plaintiff submitted additional evidence in the form of a "motion for addendum of exhibits" on December 26, 2012 (Doc. 70), and a "motion for key addendum countering Defendants' falsification of facts" on January 3, 2013. (Doc. 71). Although this evidence was submitted after the close of discovery, the Court will grant Plaintiff's motions and consider the evidence because the subject matter of the additional evidence is within the scope of the materials previously produced during discovery and therefore not unduly prejudicial towards Defendants, because Defendants have not objected to the additional submissions, and because courts may give *pro se* litigants some leeway when applying procedural rules. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) ("We are especially likely to be flexible when dealing with imprisoned pro se litigants."); *Borden Co. v. Sylk*, 410 F.2d 843, 845 (3d Cir. 1969) ("It is a well-established principle that the scope and conduct of discovery are within the sound discretion of the trial court."). Plaintiff's remaining pending motions, a motion for default judgment filed on July 7, 2014 (Doc. 79), a motion demanding a jury trial filed on May 18, 2015 (Doc. 95), and a motion to compel filed on June 22, 2015 (Doc. 96), are addressed in an order issued concurrently with this Report and Recommendation.

B. FACTUAL BACKGROUND

On November 21, 2003, Plaintiff was sentenced to serve between 6 and 12 years in prison by the Court of Common Pleas of Erie County after pleading guilty to drug-related crimes. (Doc. 83, at 23). Accordingly, Plaintiff has a maximum sentence date of 2016, and he has been eligible for parole since 2010. (Doc. 69-5, at 16-17). PBPP has continuously denied Plaintiff's requests for parole since he first became eligible in July 2010. (Doc. 1, at 2). Plaintiff alleges that PBPP officials told him at his initial parole hearing that in rendering its decision, the PBPP would review "whether [Plaintiff] completed a treatment program for substance abuse therapeutic community." (Doc. 1, at 2). Specifically, the DOC prescribed that Plaintiff complete a treatment program as one of the criteria for Plaintiff to be recommended for parole. (Doc. 69-5, at 33-37). Although Plaintiff completed all the other DOC criteria, he refuses to enroll in a treatment program at SCI-Coal Township on the basis that the prison's treatment options are incompatible with his religious beliefs.[2] (Doc. 61, at 1). Plaintiff is a Moorish American, one who belongs to the Moorish Science Temple of America.[3] (Doc. 61, at 1). Consequently, the DOC refuses to recommend that Plaintiff be

---

[2] Plaintiff initially joined the waiting list to enroll in the treatment program but withdrew upon touring the program's facilities and determining that it would violate his religious beliefs. (Doc. 69-5, at 19).

[3] In *Great Seal Moorish Science Temple of America, Inc. v. New Jersey*, the Honorable Judge Pratter of the United States District Court for the Eastern District of Pennsylvania described the Moorish Science Temple of America as follows:

The Moorish Science Temple of America was founded by Timothy Drew, a/k/a Noble Drew Ali, in 1913. . . . Drew preached that all African-Americans are of Moorish descent and thus are not citizens of the United States. *See United States v. James*, 328 F.3d 953, 954 (7th Cir. 2003). Drew instructed his followers that all "Moorish Americans" must carry a "Moorish passport" bearing one's "real" name, which was often created fictitiously by adding names that Drew claimed corresponded to the three ancient

*(footnote continued on next page)*

granted parole. (Doc. 69-5, at 38-39). Although PBPP may grant or deny parole regardless of the DOC's recommendation,[4] it is undisputed that a DOC recommendation would maximize Plaintiff's chances of being granted parole. (Doc. 69-5, at 38-39). Furthermore, Plaintiff alleges that PBPP informed him that completion of the treatment program and obtaining a recommendation from the DOC are the only outstanding requirements that Plaintiff has yet to fulfill. (Doc. 69-5, at 38-39).

The DOC specifically recommended that Plaintiff complete the Therapeutic Community ("TC") treatment program at SCI-Coal Township. (Doc. 69-2, at 6). SCI-Coal Township officials determine whether to recommend an inmate for TC by administering the Texas Christian University ("TCU") drug screen, which questions an inmate's prior alcohol and drug use and dependency.[5] (Doc. 69-3, at 3-4). TC is an intensive six-month alcohol

---

Morroccan tribes, "Ali," "Bey," or "El," to one's given birth name. *See United States v. Darden*, 70 F.3d 1507, 1516 n.1 (8th Cir. 1995).

The Moors claim certain rights as a result of the Treaty of Peace and Friendship of 1786, entered into by the United States of America and the Kingdom of Morocco (the "Treaty"). According to the Moors, the Treaty subjects them only to the laws of Morocco, including the taxing provisions. Moreover, the Moors do not believe that African Americans are technically citizens of the United States within the meaning of the United States Constitution as a result of many of the Moors' predecessors being brought to the United States as slaves. Thus, they contend that descendants of slaves are not subject to the laws established pursuant to the Constitution.

No. CIV.A. 05-CV-345, 2005 WL 2396311, at *1 n.1 (E.D. Pa. Sept. 28, 2005).

[4] In fact, Plaintiff was granted parole with respect to a previous sentence over an objection from the DOC. (Doc. 69-5, at 33).

[5] The TCU drug screen does not concern itself with inmates' religious beliefs. (Doc. 69-3, at 3-4). Although Plaintiff is aggrieved that the drug screen was developed by TCU, a Christian institution, he does not contend that the screening itself contained any religious

*(footnote continued on next page)*

and/or drug abuse treatment program in which inmates reside together in a separate housing tier of the prison, meet for self-help sessions at least twice a week, and agree to abide by TC rules. (Doc. 69-3, at 5-6). A focal point of these rules is that inmates must participate in group therapy and community meetings. (Doc. 69-3, at 6). An inmate may choose between several self-help programs in TC, including Alcoholics Anonymous ("AA"), Narcotics Anonymous ("NA"), Secular Organizations for Sobriety ("SOS"), and Self-Management Recovery Training ("SMART"). (Doc. 69-3, at 7). SOS and SMART are the two most popular of the handful of secular programs developed as an alternative to twelve-step programs such as AA that contain a spiritual component. (Doc. 69-3, at 7).

However, SCI-Coal Township officials acknowledge that AA and NA remain by far the most popular treatment programs, whereas the secular programs generally only have one or two inmates enrolled at any given time. (Doc. 69-3, at 8-9). As a result, AA and NA members typically meet in groups within the TC unit during the scheduled self-help sessions, whereas the inmates participating in the secular programs are expected to check out the secular self-help program materials from the TC library and review them individually. (Doc. 69-3, at 8-9). Although SCI-Coal Township officials assert that TC is nonreligious and nondenominational (Doc. 69-2, at 4), Plaintiff contends that TC as a whole remains inherently religious because it was originally founded on Christian values and ideology (Doc. 83, at 3-5), and because AA and NA hallmarks such as the twelve steps and the serenity prayer are displayed on the walls of the facility. Furthermore, although Defendants contend that Plaintiff is mistaken in his belief that all TC inmates must learn

---

content. (Doc. 61, at 3-4). Moreover, he also fails to provide evidence that TCU has any relation to the TC program aside from the initial screening. (Doc. 61, at 3-4).

and adhere to the twelve steps (Doc. 69, at 16; Doc. 69-5, at 25), Plaintiff counters by producing a page from the TC program operations manual that includes an introduction to the twelve-step recovery process among the goals for inmates when they first join TC. (Doc. 70, at 1-2).

Plaintiff's opposition to TC is based on his beliefs as a Moorish American. (Doc. 61, at 2). Specifically, Plaintiff notes that the Holy Koran of the Moorish Science Temple of America provides as follows:

> 6. We, as a clean and pure nation descended from the inhabitants of Africa, do not desire to amalgamate or marry into the families of the pale skin nations of Europe. Neither serve the gods of their religion, because our forefathers are the true and divine founders of the first religious creed, for the redemption and salvation of mankind on earth.

> 7. Therefore, we are returning the Church and Christianity back to the European nations, as it was prepared by their forefathers for their earthly salvation.

(Doc. 83, at 14).

Plaintiff contends that this instruction for Moorish American adherents to avoid amalgamation with "the pale skin nations of Europe" also prohibits the mixing of European literature and ideas. (Doc. 60, at 7). Furthermore, he states that Moorish Americans specifically must stay away from any vestiges of Christianity. (Doc. 83, at 3). Therefore, although the Christian aspects of AA and NA offend Plaintiff's religious beliefs most deeply, he finds even the concept of group meetings and the common community bonds that are inherent to TC to be incompatible with Moorish American teachings because this concept requires "amalgamating" with European individuals and ideas. (Doc. 69-5, at 20-21). Accordingly, even if TC was completely devoid of religious practice and believers, Plaintiff infers that TC would still violate his religious beliefs because he is prohibited from associating with and conforming to a community other than his own. (Doc. 69-6, at 36-37).

On the other hand, Plaintiff admits that he has completed other DOC programs and follows prison regulations despite the fact that these programs and rules often also violate his religious beliefs. (Doc. 69-6, at 65).

## II.   STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008).

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

> *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

Thus, "when presented with cross[-]motions for summary judgment, the Court must consider the motions separately, and view the evidence presented for each motion in the light most favorable to the nonmoving party." *Borrell v. Bloomsburg Univ.*, 63 F. Supp. 3d 418, 433 (M.D. Pa. 2014) (citations omitted). "[E]ach movant must demonstrate that no genuine issue of material fact exists; if both parties fail to carry their respective burdens, the court must deny [both] motions. *Quarles v. Palakovich*, 736 F. Supp. 2d 941, 946 (M.D. Pa. 2010) (citing *Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008)).

## III. DISCUSSION

### A. SECTION 1983 CLAIMS

Plaintiff brings several claims pursuant to 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

1. **Defendants Chismar and Vivian are the only proper Defendants to Plaintiff's Section 1983 Claims**

As a preliminary matter, it is well-settled law that neither states nor their agencies are "persons" subject to suit under § 1983. *Curtis v. Everette*, 489 F.2d 516, 521 (3d Cir. 1973). Defendants PBPP and DOH therefore is not subject to suit under § 1983 by virtue of their status as agencies of the Commonwealth. Furthermore, "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," because a suit against state officials acting in their official capacity constitutes a suit against the state itself. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Melo v. Hafer*, 912 F.2d 628, 635 (3d Cir. 1990) *aff'd*, 502 U.S. 21 (1991). However, Plaintiff's § 1983 claims against the Defendant state officials may proceed as claims against the officials in their individual capacities. *See Melo*, 912 F.2d at 635.

Defendants further contend that Plaintiff's § 1983 claims against Defendants McVey, Beard, Varano, Pyar, Varner, and Miller must fail because Plaintiff does not allege that

these officials were involved in any wrongdoing that is cognizable under the constitution. (Doc. 68, at 22). "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988)). However, "[a] defendant . . . cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). Moreover, "[a]llegations of . . . actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode, 845 F.2d at 1207.*

Here, Plaintiff fails to allege that Defendants McVey, Beard, Varano, Pyar, Varner, and Miller had actual knowledge and acquiesced to any wrongdoing. For example, Plaintiff's sole assertion against McVey is that her staff denied Plaintiff parole and informed him that they would consider whether or not Plaintiff completed TC at his next parole hearing. (Doc. 1, at 2). Because Plaintiff does not allege that McVey was personally involved in his parole hearing, and because McVey cannot be held liable for the actions of the PBPP officers underneath her, she is entitled to summary judgment on Plaintiff's § 1983 claim. *See Keller v. PA Bd. of Prob. & Parole*, 240 F. App'x 477, 480 (3d Cir. 2007) (granting summary judgment to then-PBPP Secretary for lack of personal involvement in parole decision). Likewise, Plaintiff names Defendant Beard, who at the time was Secretary of the DOC, but only alleges that he was "responsible for the decisions of the staff within the [DOC]." (Doc. 1, at 2). Plaintiff's § 1983 claim against Beard thus also must fail because Plaintiff does not raise any theory of liability as to Beard other than respondeat superior. *See*

*Padilla v. Beard*, No. 1:CV-06-0478, 2006 WL 1410079, at *3 (M.D. Pa. May 18, 2006) ("[A]n allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to § 1983 liability.").

Defendants Varano, Pyar, Varner, and Miller each appear to be named as Defendants solely because they did not satisfactorily resolve Plaintiff's grievances.[6] (Doc. 1, at 4). However, "[b]ecause prisoners have no constitutional right to a grievance process, the tenor or existence of [an officer's] response d[oes] not violate [the prisoner's] constitutional rights." *Davis v. Samuels*, No. 14-4162, 2015 WL 1412097, at *2 (3d Cir. Mar. 30, 2015). Moreover, Plaintiff's filing of a grievance alone does not establish that Defendants acquiesced to wrongdoing because "participation in after-the-fact review of a grievance is not enough to establish personal involvement." *Torres v. Clark*, No. 1:CV-10-1323, 2010 WL 3975640, at *2 (M.D. Pa. Oct. 8, 2010); *see Pressley v. Beard*, 266 F. App'x 216, 218 (3d Cir. 2008) ("The District Court properly dismissed these [supervisory] defendants . . . based on their failure to take corrective action when grievances or investigations were referred to them."); *Ramos v. Pennsylvania Dep't of Corr.*, No. 4:CV-06-1444, 2006 WL 2129148, at *3 (M.D. Pa. July 27, 2006) ("[C]ontentions that certain correctional officials violated an inmate's constitutional rights by failing to follow proper procedure or take corrective action following his submission of an institutional grievance are generally without merit.").

---

[6] Although Defendants' brief in support of their motion for summary judgment did not include Miller among the Defendants that should be dismissed for lack of personal involvement, a review of the record reveals that Miller's only involvement in this complaint stems from his response to Plaintiff's grievance. (Doc. 1, at 4). Accordingly, the Court finds it appropriate to examine *sua sponte* whether Miller had any personal involvement in the alleged constitutional deprivation. *See, e.g., Johnstone v. United States*, 980 F. Supp. 148, 152 (E.D. Pa. 1997) (dismissing public official from *pro se* prisoner's civil rights complaint *sua sponte* for lack of personal involvement).

Therefore, Defendants Varano, Pyar, Varner, and Miller each should be granted summary judgment for their lack of personal involvement in the alleged misconduct that gives rise to Plaintiff's § 1983 claim.

Accordingly, Defendants Chismar and Vivian are left as the only two Defendants against whom Plaintiff has alleged sufficient personal involvement to state a valid § 1983 claim.

### 2. **First Amendment Claims**

#### a. Establishment Clause Claim

Plaintiff first alleges that his constitutional rights are being violated by Defendants because he is being coerced into participating in a TC program that has a religious component. The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion . . . ." U.S. CONST. amend I. The Supreme Court of the United States has stated that, "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise . . . ." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). The United States Court of Appeals for the Third Circuit has recognized that "[t]he government violates the First Amendment's Establishment Clause when it requires a prisoner to participate in a drug or alcohol rehabilitation program with a religious component." *Bobko v. Lavan*, 157 F. App'x 516, 518 (3d Cir. 2005). Furthermore, an inmate is deemed to be required to participate in a program if the refusal to participate adversely affects the inmate's parole eligibility. *Bobko*, 157 F. App'x at 517; *Kerr v. Farrey*, 95 F.3d 472, 473-74 (7th Cir. 1996); *Harris v. Risbon*, No. 3:CV-15-0121, 2015 WL 507344, at *2 (M.D. Pa. Feb. 6, 2015); *Martz v. SCI-Coal Twp. Therapeutic Cmty.*, No. 3:11-CV-830, 2013 WL 4761123, at *5 (M.D. Pa. Sept. 4, 2013). In

the case at bar, Plaintiff contends that he is entitled to summary judgment because the TC program is religious in nature, and he will not be recommended for parole unless he completes TC. (Doc. 61, at 1-2). Defendants counter, however, that they offer several secular programs that serve as non-religious alternatives to twelve-step programs such as AA and NA. (Doc. 68, at 18-19). *See Bobko*, 157 F. App'x at 518 (affirming summary judgment in favor of prison officials where the officials submitted evidence that a secular approach to recovery was offered within TC program).

The central question in determining if either party is entitled to summary judgment thus becomes whether the secular recovery programs truly are available as an alternative to the more traditional twelve-step programs that have a religious component. *Compare Bobko, 157 F. App'x at 518 n.2* ("[Plaintiff]'s argument that SOS is not a viable alternative is without merit. He relies upon a document in which an official explains that SOS is not alone an alternative to TC, but is available as a framework within the TC program."), *with Martz, 2013 WL 4761123, at *5* (denying summary judgment where plaintiff raised a dispute of material fact as to whether the secular alternatives within TC were actually offered or really only existed on paper). Here, Defendants provided a declaration from Defendant Vivian that states that since 2000, SCI-Coal Township has offered secular self-help programs that do not rely on the existence of a "higher power," as an alternative to traditional twelve-step programs. (Doc. 69-3, at 8). The literature for these programs is available in the TC library and may be checked out by inmates to review individually or with others during the scheduled self-help periods or during TC free time. (Doc. 69-3, at 8). Defendants also provided copies of the publication information for several of SCI-Coal Township's secular self-help books. (Doc. 69-4, at 148-68). Because these secular programs are available as an

alternative, Vivian claims that no TC participant is forced to participate in or subscribe to religious or spiritual activities. (Doc. 69-3, at 9).

Plaintiff, on the other hand, asserts that the secular programs are not available as a legitimate alternative because all inmates in TC are subjected to the twelve steps, even if they enroll in a secular program rather than AA or NA. (Doc. 69-5, at 25). In support of this contention, Plaintiff produced an excerpt from the TC program operations manual that includes as one of the goals for inmates upon joining TC that they be "educated to the disease of addiction and the process of recovery in a 12-step program." (Doc. 70, at 2). Furthermore, Plaintiff alleges in his deposition that religious content such as the twelve steps and the serenity prayer are posted on the walls of the TC facility. (Doc. 69-6, at 27).

The Court finds that these factual contentions are sufficient to preclude summary judgment for either party at this time. Plaintiff has submitted evidence to show a question of material fact as to whether all TC participants are expected to learn about the twelve steps, even if they wish to participate in a secular alternative program. The mere presence of secular recovery books in the library does not by itself prove the existence of an alternative program, especially if all inmates are still expected to participate in spiritual activities such as learning the twelve steps.[7] *See Martz*, 2013 WL 4761123, at *3 n.5 ("The issue of whether there were secular group meetings is different from the question of whether an individual secular option was provided."). Moreover, Plaintiff's claim that the serenity prayer and the twelve steps were posted on the walls of TC also implies that Defendants may favor AA and

---

[7] The exact features of these secular recovery programs remain unclear, to the extent that such programs exist in any tangible form beyond the secular recovery books available in the TC library.

other spiritual programs over any secular alternatives. *See Lee*, 505 U.S. at 627 (Souter, J., concurring) ("This principle against favoritism and endorsement has become the foundation of Establishment Clause jurisprudence . . . ."). Accordingly, the Court recommends that Plaintiff's Establishment Clause claim be allowed to proceed, and that both motions for summary judgment be denied with respect to this claim. However, the Court also recommends that the parties be granted an additional opportunity to file dispositive motions with respect to this matter.[8]

### b.   Free Exercise Clause Claim

Plaintiff next alleges that TC unconstitutionally infringes upon his right to exercise his Moorish American faith, because in TC he would be forced to amalgamate with members of "the pale skin nations of Europe" and be exposed to Christian beliefs. (Doc. 61, at 2). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). But "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston*, 334 U.S. 266, 285 (1948). "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives — including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone*, 482 U.S. at 348. "Thus, a

---

[8] Further dispositive motions may be particularly appropriate if there have been changes to either the structure of TC itself or to the alternative secular programs offered, during the time that has elapsed since discovery was first conducted in this matter. Moreover, given that Plaintiff has not participated in TC himself, his factual assertions would be bolstered by providing an affidavit in accordance with Federal Rule of Civil Procedure 56(c) from an inmate that has actually taken part in the TC program.

prison inmate 'retains [only] those rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

As a threshold matter, "[t]he mere assertion of a religious belief does not automatically trigger First Amendment protections . . . . To the contrary, only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection." *DeHart*, 227 F.3d at 51. "Thus, if a prisoner's request . . . is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request . . . ." *DeHart*, 227 F.3d at 52. But "a religious practice is protected even if it is not deemed to be mandatory or practiced by every member of the religion." *Daley v. Lappin*, 555 Fed. App'x 161, 164 (3d Cir. 2014); *see also DeHart*, 227 F.3d at 56 ("It would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others.").

Here, Defendants concede that Plaintiff's beliefs are sincerely held, but they appear to assert that those beliefs are socio-political rather than religious in nature. (Doc. 68, at 20-21 & n.3). "Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Wisconsin v. Yoder*, 406 U.S. 205, 215-16 (1972). The Third Circuit looks to the following three indicia in determining whether a belief system is religious in nature: "(1) an attempt to address 'fundamental and ultimate questions' involving 'deep and imponderable matters'; (2) a comprehensive belief system;

and (3) the presence of formal and external signs like clergy and observance of holidays."

*Sutton v. Rasheed*, 323 F.3d 236, 251 n.30 (3d Cir. 2003), *as amended* (May 29, 2003) (citing

*Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3d Cir. 1981)). Here, Defendants critique that the

individual practice Plaintiff seeks an accommodation for "bespeaks of intolerance and

extremism" and is socio-political in nature, but they fail to address the broader question of

whether Moorish Americans adhere to a belief system that is religious in nature. (Doc. 68,

at 21). Indeed, there is no dispute that the central tenets of the Moorish American faith meet

the requirements of religion as set out in *Africa*. *See Sutton*, 323 F.3d at 250, 252 (determining

that Nation of Islam adherent's beliefs were religious in nature where adherent-inmate had

been denied Nation of Islam reading materials because the prison deemed the reading

materials "not essentially religious" and to "smack of racism and hatred"). Given

Defendants' failure to create a genuine issue of material fact, the Court therefore concludes

that Plaintiff's sincerely-held views are sufficiently based in religion to implicate First

Amendment protection.

However, as noted above, "incarceration almost always results in a narrowing, not a

broadening, of constitutional protections." *Fraise v. Terhune*, 283 F.3d 506, 515 (3d Cir.

2002). "[P]rison regulations that curtail an inmate's constitutional rights need only be

reasonably related to legitimate penological objectives." *Fraise*, 283 F.3d at 515. The Court

must therefore weigh the following four factors to determine whether a prison regulation is a

reasonable restriction on the exercise of religion: (1) a "valid, rational connection between

the prison regulation and [a] legitimate governmental interest;" (2) "whether [the inmates or

detainees have] alternative means of exercising" the religious practice; (3) whether

accommodating the religious practice would adversely affect corrections officers and other

inmates and detainees; and (4) whether an alternative to the restriction exists "that fully accommodates the prisoner's rights at *de minimus* cost to valid penological interests . . . ." *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).

Here, the *Turner* test indicates that any restriction placed on Plaintiff's exercise of his religion is clearly reasonable in relation to the DOC's legitimate penological interests. The first *Turner* factor requires a determination of "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989). The state holds a legitimate interest in rehabilitating inmates, and conditioning an inmate's parole recommendation on the completion of a rehabilitation program is rationally related to that objective. *Roman v. DiGuglielmo*, 675 F.3d 204, 215 (3d Cir. 2012). Moreover, this restriction is applied in a neutral fashion, as the determination of whether an inmate is recommended for TC is not made on the basis of the inmate's religious beliefs (Doc. 69-3, at 3-4), and all inmates in TC participate in self-improvement group activities based on ideas that allegedly come from "the pale skin nations of Europe." Accordingly, the first *Turner* factor supports upholding the restriction as reasonable.

The second *Turner* factor inquires into whether the inmate has other means of exercising his religious beliefs. "If the prison does afford the inmate alternative means of expressing his religious beliefs, that fact tends to support the conclusion that the regulation at issue is reasonable." *DeHart*, 227 F.3d at 57. Here, although participation in TC might require Plaintiff to amalgamate with members of "the pale skin nations of Europe," Defendants also made clear that TC provides inmates with many opportunities for self-study and independent reflection. (Doc. 69-3, at 8-9). Accordingly, while the community aspect of

18

TC may not conform with Plaintiff's religious beliefs, he does have some alternative means of expressing those Moorish American beliefs while in TC. As a result, the second *Turner* factor also indicates that the restrictions imposed on Plaintiff's exercise of his Moorish American faith are reasonable.

The third *Turner* factor requires the Court to assess the impact that accommodating Plaintiff's religious beliefs would have on corrections officers, other inmates, and the allocation of prison resources. If the DOC were to remove the completion of TC as a prerequisite to being recommended for parole, fewer inmates would enroll in TC and get needed treatment, and thus the DOC's "compelling governmental interest [in] the safety and security of the institution" would be jeopardized. *Jefferson v. Wolfe*, No. CIVA 04-44 ERIE, 2007 WL 869630, at *9 (W.D. Pa. Mar. 16, 2007). Moreover, to the extent that Defendants could possibly create a separate treatment program specifically for Moorish American inmates, such a program would certainly come at much more than a *de minimus* cost in terms of the burden on staff resources. *Turner*, 482 U.S. at 90-91. Any sort of special treatment or exemption for Moorish American inmates with regard to TC would also likely subject Defendants to future Establishment Clause suits. *Jefferson*, 2007 WL 869630, at *9. Accordingly, this factor also weighs in favor of Defendants.

The final *Turner* factor calls for an analysis of whether Plaintiff's beliefs can be accommodated at *de minimus* cost to valid penological interests. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. As discussed above with regard to the third *Turner* factor, any alternative that accommodates Plaintiff's religious beliefs would come at a significant cost to

penological interests. If the prison were to no longer make completion of TC a prerequisite to parole, it is likely that the safety and security of the prison would be compromised. *Jefferson*, 2007 WL 869630, at *9. If the prison were to develop a separate treatment program catered towards Moorish Americans, the cost of developing and implementing the new program would be far more than *de minimus*, especially when considering the small Moorish American population at SCI-Coal Township. (Doc. 69-6, at 49). Accordingly, the final *Turner* factor also supports Defendents' position that the restriction on Plaintiff's exercise of his religion is reasonable.

In sum, each of the *Turner* factors weigh in favor of the Defendants. For this reason, the Court finds the DOC requirement that Plaintiff complete TC as a prerequisite to gaining a recommendation for parole was a reasonable restriction on Plaintiff's exercise of religion. The Court therefore recommends that Defendants be granted summary judgment with respect to Plaintiff's free exercise claim.

B. RLUIPA CLAIM

Plaintiff also claims that participation in TC would impose an unjustifiable burden on the practice of his faith in violation of RLUIPA. Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C.A. § 2000cc-1(a). RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C.A. § 2000cc-5 (7)(A). Although

Congress intended RLUIPA to be construed "in favor of a broad protection of religious exercise," 42 U.S.C. § 2000cc-3(g), it also "anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (quoting RLUIPA's legislative history). The Supreme Court therefore reasons that when "requests for religious accommodation become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the [prison is] free to resist the imposition." *Cutter*, 544 U.S. at 726. Finally, "RLUIPA confers no privileged status on any particular religious sect, and singles out no bona fide faith for disadvantageous treatment." *Cutter*, 544 U.S. at 724.

The Third Circuit has established a two-step burden-shifting analysis to evaluate the merits of an RLUIPA claim. First, "[a] plaintiff-inmate bears the burden to show that a prison institution's policy or official practice has substantially burdened the practice of that inmate's religion." *Washington v. Klem*, 497 F.3d 272, 277–78 (3d Cir. 2007). A burden on religious practice is substantial where:

> 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; [or] 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

> *Washington*, 497 F.3d at 280.

Once the inmate satisfies his burden of showing that his religious practice has been substantially burdened, the defendant may then rebut by showing "that the policy is in

furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest." *Washington*, 497 F.3d at 283.

Here, even if the Court assumes that TC imposes a substantial burden on Plaintiff's exercise of religion, the accommodation Plaintiff seeks is clearly excessive under *Cutter*. *See* 544 U.S. at 726. Because Plaintiff claims his faith does not allow him to "amalgamate [with] the pale skin nations of Europe" (Doc. 83, at 14), he believes that he should not be required to complete a community-based self-improvement program such as TC as a prerequisite to receiving a recommendation for parole. (Doc. 69-6, at 36-37). However, the accommodation that Plaintiff seeks—an exemption from prison self-improvement programs that he feels are based on European ideas—would inherently jeopardize the functioning of the prison because it grants Plaintiff veto power over prison rules and regulations.[9] *See* 544 U.S. at 726. As Defendants note in the brief in support of their motion for summary judgment, corrections officers' ability to enforce rules and regulations is critical to the safe operation of any prison, and whatgranting Plaintiff an accommodation to allow him to flout prison regulations would directly undermine that compelling security interest. (Doc. 68, at 20-21). *See Williams v. Morton*, 343 F.3d 212, 218 (3d Cir. 2003) ("[W]hen a challenged regulation implicates security, as it does here, judicial deference is especially appropriate."). Furthermore, there is no less restrictive alternative that could accommodate Plaintiff's religious beliefs, because the prison cannot be expected to design a separate set of rules and

---

[9] Although Plaintiff states a colorable claim that TC also violates the Establishment Clause and his faith's directive to avoid Christianity, Plaintiff makes clear that TC and other SCI-Coal Township policies and programs would still violate his religious beliefs, even if they were completely secular, because the prison programs require amalgamation with European ideas. (Doc. 69-6, at 65-66).

regulations exclusively for Moorish American inmates that is "consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723. Even if there was a safe and cost-effective way for SCI-Coal Township to implement separate rules for Moorish Americans, it would likely violate the Establishment Clause by "singl[ing] out a particular religious sect for special treatment . . . ." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 706 (1994). Accordingly, the Court recommends that Defendants be granted summary judgment with respect to Plaintiff's RLUIPA claim.

C. STATE LAW CLAIMS

Plaintiff also alleges that the DOC operates TC in violation of several state administrative regulations, including the failure to obtain a license from the DOH, 28 PA. CODE § 709.2, hiring clinical supervisors and counselors that were not properly qualified for their positions, 28 PA. CODE § 704.6-704.7, and exceeding the maximum counselor to client ratio, 28 PA. CODE § 704.12. However, Plaintiff fails to cite any law that grants private parties the right to sue a state agency to enforce state DOH regulations. The Eleventh Amendment bars suits brought by private parties against a state in federal court unless the state consents to be sued. *Laskaris v. Thornburgh*, 661 F.2d 23, 25 (3d Cir. 1981). The Eleventh Amendment's protections extend to state agencies, including the Pennsylvania DOC. *Laskaris*, 661 F.2d at 25; *Kretchmar v. Beard*, No. CIV.A. 05-6108, 2006 WL 2038687, at *3 (E.D. Pa. July 18, 2006). Moreover, Pennsylvania specifically exercises its Eleventh Amendment immunity rights to withhold consent from suit in federal court. 42 PA. CONS. STAT. § 8521. The Defendant state agencies are therefore immune from suit for the alleged violations of DOH regulations. Additionally, the Eleventh Amendment forecloses Plaintiff from claims against state officials—regardless of whether they are sued in their official or

individual capacities—that are brought in federal court and based entirely on state law.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984) ("A federal court's grant of relief against state officials on the basis of state law . . . does not vindicate the supreme authority of federal law. . . . [I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law.") The Court therefore recommends that each of Plaintiff's Pennsylvania state law claims be dismissed with prejudice.

## IV.   RECOMMENDATION

Based on the foregoing, it is recommended that:

1. The Plaintiff's motion for summary judgment (Doc. 60) be **DENIED**;

2. The Defendants' motion for summary judgment (Doc. 67) be **GRANTED** in part and **DENIED** in part;

3. Defendants' motion for summary judgment be **DENIED** without prejudice as it pertains to Plaintiff's Establishment Clause claim against Defendants Chismar and Vivian;

4. Defendants' motion for summary judgment be **GRANTED** as to all other Defendants and all other clams, and the Clerk of Court be directed to **TERMINATE** Defendants Beard, McVey, Miller, Pyar, Varano, Varner, the Pennsylvania Board of Probation and Parole, and the Pennsylvania Department of Health, Office of Drug and Alcohol Programs as parties to this case; and

5. The case be remanded to the undersigned for further proceedings.

**BY THE COURT:**

Dated: August 14, 2015

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

CHARLES WILLIAMS BEY,

               Plaintiff

    v.

PENNSYLVANIA BOARD OF
PROBATION AND PAROLE, et al.,

               Defendants

CIVIL ACTION NO. 1:10-CV-02597

(CAPUTO, J.)
(MEHALCHICK, M.J.)

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **August 14, 2015**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**Dated: August 14, 2015**

*s/ Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**